ELIZABETH BURKE, Admx., Defendant in Error, *vs.* THE
TOLEDO, PEORIA AND WESTERN RAILWAY COMPANY,
Plaintiff in Error.

*Opinion filed June 24, 1915—Rehearing denied October 7, 1915.*

1. APPEALS AND ERRORS—*what ·question is raised by request for·
instruction directing verdict for defendant.* A request for an in-
struction directing a verdict for the defendant in an action for
personal injuries raises the question whether there is any evidence
which, with all reasonable inferences to be drawn therefrom, will
·justify a verdict for the plaintiff.

2. NEGLIGENCE—*what does not show negligence by brakeman
as a matter of law.* The mere fact that a freight brakeman hangs
to the ladder on the side of a car during a switching movement
when passing a station platform on which a loaded truck had been
placed in anticipation of the arrival of a passenger train does not
show negligence on his part as a matter of law, where the circum-
stances in evidence tend to show that his attention was directed to
the passenger train coming from the rear and that the smoke and
cinders from the freight engine were blowing toward him, so that
he did not see the truck in time to avoid striking it.

3. SAME—*what risk is not assumed by brakeman as a matter
of law.* A freight brakeman does not necessarily and as a mat-
ter of law assume the risk of injury from striking a baggage and
express truck while he is hanging from the ladder on the side of
a freight car during a switching operation requiring the movement
of the car past the station platform near the edge of which the
station agent had placed the truck in anticipation of the arrival of
a passenger train, where there is no evidence that he knew, or
had reason to apprehend, that the truck would be so placed as to
imperil his life or limbs during the switching operation or that he
·knew of any custom of so placing the truck.

4. SAME—*what is not improper cross-examination.* Where a
station agent testifies, in substance, that he did not receive or
communicate to the crew of a freight train any information as to
a passenger train being late before the freight train backed into a
siding and that he did not know that any switching was to be
done past the platform before the arrival of the passenger train,
it is proper to show, upon cross-examination, that when giving
switching directions to the freight crew he learned that four cars
from the freight train would have to be moved from the siding
past the station platform, and that this had not been done, to his
knowledge, when he placed a loaded baggage and express truck
near the edge of the platform.

5. SAME—*general rule as to assumption of risk of danger due to master's negligence.* Such dangers as may arise from the master's negligence are not assumed by virtue of the original contract of employment, which merely covers the risks ordinarily incident to the employment, but if, during the course of the employment, the servant becomes aware of a dangerous condition or such condition is so obvious to persons of ordinary intelligence that the servant must be held to have knowledge of it, and he continues in the service without any promise of change or repair, he assumes the risk of such dangerous condition even though it has arisen from the negligence of the master.

6. SAME—*when giving incorrect instruction will not reverse.* Giving an instruction capable of being understood as holding that a servant does not, under any circumstances, assume the risk of a danger due to the master's negligence is not ground for reversal, though incorrect, where there is nothing in the evidence concerning the circumstances of the accident which would warrant a finding, under a correct application of the law, that the servant had assumed the risk.

7. SAME—*rule as to assuming risk of dangerous custom.* If a servant, during the course of his employment, learns of a dangerous custom in the manner of conducting the business, and he continues in the employment without any promise that the custom will be changed or discontinued, he must be held to have assumed the risk incident to such custom, whether a negligent one or not.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Tazewell county; the Hon. T. N. GREEN, Judge, presiding.

FRANK T. MILLER, JOHN M. ELLIOTT, and GEORGE C. RIDER, (STEVENS, MILLER & ELLIOTT, of counsel,) for plaintiff in error.

JESSE BLACK, JR., for defendant in error.

Mr. JUSTICE WATSON delivered the opinion of the court:

Defendant in error recovered a verdict and judgment in the circuit court of Tazewell county for $7500 against plaintiff in error for negligently causing the death of Timothy Burke, her intestate. Upon appeal the judgment was

affirmed in the Appellate Court for the Third District, and the record is brought before us for review on allowance of a petition for a writ of *certiorari.*

No question is made as to the sufficiency of the declaration, and as all questions of fact have been settled adversely to the contentions of plaintiff in error, it only remains to be determined whether the judgments of the Appellate and circuit courts shall be reversed for errors of law.

At the close of the evidence for defendant in error, and again at the close of all of the evidence, plaintiff in error moved the court to instruct a verdict in its favor. These motions were overruled, and it is now insisted this was error.

The material facts as disclosed by this record are as follows: Timothy Burke was in the employ of plaintiff in error as a freight brakeman for several months prior to his death, which occurred on April 15, 1912, and at that time he was swing brakeman on freight train No. 23, which arrived from the east at Gridley on that day at or about 11:45 A. M. The switch list or switching directions for Gridley station had been sent by the station agent by wire to the conductor of No. 23 prior to its arrival there. Upon its arrival the switching ordered was partly done under the conductor's direction, and the list was then turned over to the swing man, Burke, who thereafter had charge of it. Passenger train No. 7, due to arrive at Gridley at 12:19 P. M., was reported eight minutes late, which fact was communicated to Burke by the station agent; also at the same time the incidents happened which resulted in Burke's death the passenger train, or the smoke of its engine, could be seen at Meadows, the first station east of Gridley and which was four miles distant. The passenger train's running time from Meadows to Gridley was seven minutes. At Gridley the railroad track runs east and west and the view is unobstructed from Meadows to a point west of Gridley station house or depot. The depot is on the north

side of the track.    South of the main track are two
switches or sidings.    About 425 feet east of the depot a
switch track leads off to the northeast of the main track,
and a short distance east of the connection another switch
track leads off from the last mentioned switch track.
Freight train No. 23 backed into one of the switch tracks
east of the depot at or shortly before noon, and one or two
minutes before the schedule arriving time of train No. 7,
which, as above stated, was 12:19 P. M., the station agent
and his helper placed two trucks within a few inches of
the south edge of the depot platform, near the west end
of the platform, for the purpose of loading and unloading
baggage and express from and into the express and bag-
gage car on train No. 7 upon its arrival.    The east truck
of the two so placed was loaded with egg cases, piled two
cases high.    Of this Burke had no notice unless he saw the
trucks, which he might have done had he looked that way.
At about the time the trucks were placed, Burke sent his
rear brakeman back as flagman to protect the freight train
against the passenger train, then at Meadows, and upon his
signal the engine, which was attached to the west end of
the freight train, drew four cars out of the switch and
onto the main track for the purpose of taking them west of
the depot and thence into one of the sidings south of the
main track.    Burke remained on the ground until the cut
of cars came out of the switch, then turned the switch, ran
to the side of the last car and caught onto the hand-hold
on its side, placing his feet in the bottom step or stirrup,
swinging his body out at arms' length from the car.    He
was looking toward the flagman and the passenger train,
to the east, and smoke and cinders were blowing toward
him from the freight train engine, the wind being from the
west.    The train approached the depot at the rate of twelve
miles per hour, which approximates 1000 feet per minute.
Another brakeman was on the side of a car two car-lengths,
or 70 feet, in front of Burke.    He saw the loaded trucks

in time to climb up the car ladder and escape injury and he shouted a warning to Burke. Whether it was heard or not cannot be known, as Burke's person struck the merchandise on the first or nearest truck and he was killed. He looked to the west and threw up his right arm as if to shield his eyes just before striking the obstruction.

The proof showed Burke was familiar with the rule of the company which required five minutes' clear time to be allowed prior to the arrival of the passenger train, and with another rule which required him to send back a flagman to protect both the freight and passenger train when there was an infringement by one upon the time of the other or apparent danger of collision; also that he was familiar with the custom of conducting switching operations at Gridley station after the schedule time of arrival of the passenger train when that train was late, continuing the switching until the passenger train "showed up."

The request for a directed verdict raised the question whether there was any evidence which, with all the inferences to be drawn from it, would justify a verdict for the plaintiff. It is contended that the court erred in refusing the request because there was a failure to prove that Burke was in the exercise of due care for his own safety, and because, as a matter of law, he assumed the risk of the hazard by which he lost his life. We do not think there was such a failure of evidence tending to prove due care on his part as would have justified the court in directing a verdict of not guilty. The principal argument that Burke was guilty of negligence is based upon the position he occupied in approaching the place where the trucks were standing, and we do not think such fact was evidence of negligence as a matter of law. There was no evidence that his position was not the usual one assumed by railroad brakemen engaged in the performance of switching service. In fact, the attitude assumed shows that he was prepared safely to drop off from the moving car when it should pass the

switchpoint west of the depot, so as to open that switch
and let the train back promptly onto the elevator switch
track.  Unless he saw the trucks and knew they were so
near the car as to be a source of danger there is nothing
in the position he occupied which could be charged as neg-
ligence.  The facts that his attention was attracted toward
the approaching passenger train, that smoke and cinders
were blowing towards him from the freight train engine,
and that he threw up his arm as if to shield his eyes from
the dust and smoke, together with all the other circum-
stances, tended to prove that he did not see the trucks or
their position in time to avoid the danger.  It cannot be
said that there was no evidence fairly tending to prove the
exercise of due care on his part.  The question whether or
not he was guilty of negligence was, under the evidence,
one of fact, which was properly submitted to the jury, and
the judgment of the Appellate Court has conclusively set-
tled the question in favor of his administratrix.

On the question of the assumption of risk by Burke it
is contended that the placing of the trucks which caused
his death constituted a danger so open and obvious that
he was chargeable with knowledge of the danger resulting
therefrom, and that he necessarily knew of the custom of
placing trucks as those in question were placed at the time
of the arrival of a passenger train, and therefore he as-
sumed the risk.  While it may be reasonably claimed that
Burke was acquainted with the general custom of using
trucks in connection with handling baggage and express to
and from passenger trains, there is no evidence that the
trucks were ever placed as they were during switching op-
erations other than on the day of his death, or that they
had ever been placed there so long prior to the actual ar-
rival of the passenger train and left unguarded while the
switching of freight cars was in progress.  In the case of
*Illinois Central Railroad Co.* v. *Welch*, 52 Ill. 183, this
court, in discussing the proposition that a person engaged

in a particular service, and knowing, or having the means of knowing, all the conditions of that service, assumes the risks incident thereto, said: "As a general legal proposition this is undoubtedly true, but we are of opinion it does not cover the facts of this case. There are many freight depots and station houses upon the line of the Central railway, and it would be preposterous in us to say, or to ask a jury to say, that a brakeman engaging in the service of the company must be held to know whether or not there may be one among them whose roof or awning so projects over the line of road that a brakeman on a freight train, in the performance of his duties, would be liable to be swept from the train by collision with it. * * * It would have been morally impossible for him to have ascertained the existence of all such special perils as this which caused the injury. * * * Moreover, it is to be remarked that the danger was of such a character that it might well escape the observation of a person who had been even for a long time upon the road." In this case, so far as the evidence shows, a similar risk had never before been incurred. Whether Burke did or did not have actual knowledge of a custom of placing trucks where they would imperil his life or limb was a question of fact, under the evidence, which the court was required to submit to the jury. In fact, there was an entire lack of evidence that he knew or had reason to apprehend the danger to which he was exposed. The court did not err in refusing to direct a verdict.

Plaintiff in error urges that the court erred in permitting a cross-examination of the station agent, its witness, not responsive to the examination in chief. The witness testified that he did not receive or communicate any information as to the passenger train being late before the freight train went onto the switch track east of the Gridley depot, and that he did not know the freight train, which was east of the Gridley station just before the accident,

was to be moved westward toward and past the trucks before the arrival of train No. 7. It was proper to permit the fact to be developed, on cross-examination, that in communicating to the crew the switching directions he did learn, and knew, the four cars in question had to be taken from the siding past the station and backed onto the elevator track, and that prior to placing the loaded trucks this had not been done within his knowledge.

The greatest insistence for the reversal of the judgment is placed by plaintiff in error upon the proposition that the giving of the ninth instruction for the defendant in error was reversible error. This instruction is upon the doctrine of assumed risk, and is as follows:

"The court instructs the jury, as a matter of law, that the rule that the servant assumes the ordinary risks incident to the business presupposes that the master has performed the duties of caution, care and vigilance which the law casts upon him. And you are further instructed that it is those risks, alone, which cannot be obviated by the adoption of reasonable measures of precaution by the master that the servant assumes. And you are further instructed that the law is that the servant does not assume risks that are unreasonable or extraordinary, nor risks that are extrinsic to the employment, nor risks of the master's own negligence. And you are further instructed, as a matter of law, that the master is bound to exercise care and prudence that those in his employment be not exposed to unreasonable risks or dangers, and the servant has a right to presume that the master will exercise that diligence in protecting him from injury, and it is only such injuries as have arisen after the exercise of that diligence and care on the part of the master that can be properly termed accidents or casualties which the servant has impliedly agreed to risk and for which the master is not liable."

That instruction brought together different statements made in the case of *City of LaSalle* v. *Kostka,* 190 Ill. 130,

so as to make a supposed connected exposition of the law of assumed risk, but it was materially defective. A full explanation of the doctrine as settled by repeated decisions of the court will be found in the case of *Klofski* v. *Railroad Supply Co.* 235 Ill. 146, where the court, speaking of different rules deducible from the reported cases, said: "The distinction between the two classes of cases is readily discernible when the cases themselves are carefully studied and analyzed. It will be found that the cases which exclude from the risks assumed by the servant such dangers as arise from the master's negligence are cases involving a consideration of the usual and ordinary hazards of the employment which are assumed by the original contract of hiring, and that the other line of cases which hold that the servant may assume dangers arising from the master's negligence are cases where the assumption of the danger depended not upon the contract of hiring but upon the knowledge of the servant of the existence of the danger. If the servant has, or by the exercise of reasonable care would have, knowledge of the existence of a particular danger and continues in the employment without complaint he will be deemed to have assumed the danger; and in respect to such dangers it is wholly immaterial whether they arise from the negligence of the master or from other causes. * * * The master's negligence is not an ordinary and usual risk of the employment, hence the servant does not assume dangers arising therefrom by his contract of hiring, but the servant knowing of such negligence may assume the risk, and in such case he assumes it because he knows of it and not because it has become an ordinary one."

When a servant engages in an employment he does so in view of the risks ordinarily incident to it and will be presumed to have contracted with reference to such risks and assumed them. (Cooley on Torts, 521; 20 Am. & Eng. Ency. of Law,—2d ed.—109.) In entering the employ-

ment he has a right to assume that the master will discharge his duty in using reasonable care not to expose him to danger, and such dangers as arise from the master's negligence are not assumed by the original contract of employment; but if the servant, during the course of his employment, becomes aware of a dangerous condition, although it may arise from the negligence of the master, he cannot complain if he is afterward injured by his exposure to the dangerous condition. (*Camp Point Manf. Co.* v. *Ballou,* 71 Ill. 417; *Simmons* v. *Chicago and Tomah Railroad Co.* 110 id. 340; *Chicago and Eastern Illinois Railroad Co.* v. *Geary,* 110 id. 383; *Herdman-Harrison Milling Co.* v. *Spehr,* 145 id. 329; *Chicago Drop Forge and Foundry Co.* v. *VanDam,* 149 id. 337; *East St. Louis Ice and Cold Storage Co.* v. *Crow,* 155 id. 74; *Pittsburg Bridge Co.* v. *Walker,* 170 id. 550; *Swift & Co.* v. *O'Neill,* 187 id. 337; *Chicago and Eastern Illinois Railroad Co.* v. *Heerey,* 203 id. 492; *Chicago Screw Co.* v. *Weiss,* 203 id. 536; *Hartrich* v. *Hawes,* 202 id. 334; *Chicago and Alton Railway Co.* v. *Bell,* 209 id. 25; *Shickle-Harrison & Howard Iron Co.* v. *Beck,* 212 id. 268; *Christiansen* v. *Graver Tank Works,* 223 id. 142; *Schillinger Bros. Co.* v. *Smith,* 225 id. 74.) If the dangerous condition is obvious to persons of ordinary intelligence the servant will be held to have had knowledge of it and to have assumed the risk arising therefrom. If a servant has·knowledge of a dangerous condition, whether arising from the manner in which the business is conducted or from defective machinery or appliances or other cause, and continues in the service without any promise of change or repair, voluntarily encountering a known danger, it makes no difference that the danger results from negligence of the master.

The instruction was not a correct statement of the law. Whether it is cause for a reversal of the judgment depends upon the question whether the evidence showed that there was a custom of placing trucks in the position occupied by

the trucks at the time and under the circumstances existing at the time of the accident. If there was such a custom and Burke had knowledge of it he assumed the risk, whether the custom was a negligent one or not; but, as before stated, there was an entire lack of evidence that such a custom existed or that trucks were ever so placed before the time of the accident or while freight cars were being switched on the adjacent track. In our opinion the jury could not have found from any evidence in the record that Burke had actual knowledge of a danger arising from the manner in which the business of the railroad company was conducted with reference to the location of trucks under the circumstances existing at the time or that the danger was so open and obvious that he voluntarily encountered it. The instruction, therefore, although incorrect, was not harmful.

With the exception of the above instruction we think the jury were fully and fairly informed as to the law applicable to the case. The substance of instructions offered by plaintiff in error numbered 1 and 2 and refused was given in instructions offered by it in Nos. 5, 6, 7 and 8. Repetition was unnecessary and the above instructions were properly refused.

It is insisted the giving of instructions numbered 1, 2, 5, 8 and 12 at the instance of defendant in error was erroneous. It will serve no useful purpose for this court to comment at length upon instructions numbered 1, 2, 5 and 8, as no authority is given in support of the argument that they were defective, and we agree with the trial court that they were not. It is said instruction No. 12 directs a verdict and fails to include all the elements necessary to warrant a recovery. This instruction does, in effect, direct a verdict, but it is not subject to the criticism made. Under it, considered in connection with all others in the series, the jury were warranted in finding for defendant in error if they found her intestate was exercising due care for his

own safety, that the plaintiff in error was guilty of negligence charged in the declaration, that such negligence resulted in the death of Burke, and that at the time of his death he had not assumed the risk of the conditions which caused his death. We do not find this instruction subject to the criticism made upon it and we are cited to no authority in support of that criticism.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*